# EXHIBIT 8



**Snell & Wilmer**
L.L.P.
LAW OFFICES

One Arizona Center
Phoenix, AZ 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

Joshua Grabel
602-382-6280
jgrabel@swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

August 4, 2008

**VIA EMAIL and HAND-DELIVERY**

Rex Martin, Procurement Officer
Lu Himmelstein, Chief Procurement Officer
Dept. of Public Safety
2102 West Encanto Blvd.
PO Box 6638
Phoenix, AZ 85005-6638

Jean A. Clark, State Procurement Officer
Dept. of Administration
Arizona Department of Administration
100 North 15th Avenue, Suite 104
Phoenix, AZ 85007

Re:   Bid Protest for Solicitation L8-022, Statewide Traffic Photo/Speed & Intersection Enforcement Systems, Mobile and Fixed and Request for Stay Pending Resolution of Bid Protest

To Mr. Martin, Ms. Himmelstein and Ms. Clark:

In Arizona, to be a responsive and responsible bidder on a public procurement, a bidder must be able to comply with federal, state, and local laws in performing the Contract. Here, the Department of Public Safety ("DPS") published Request for Proposal for Solicitation No. L8-022, Statewide Traffic Photo/Speed & Intersection Enforcement Systems, Mobile and Fixed ("RFP") [Exh.1] requesting bidders submit proposals to provide both fixed and mobile photo/speed enforcement systems throughout Arizona. A condition of the RFP was that all bidders "comply with all federal, state, and local laws regarding materials and services supplied under the Contract and shall maintain all applicable licenses and permits." *See* RFP at 19 (Uniform Terms and Conditions—Section 7.5). One of the component parts required to provide the underlying equipment on mobile units is a radio transmitter locator ("Radar") system. Radar systems, like the ones needed for the mobile units in the RFP, must be certified and licensed by the FCC to be legally operated in the United States. *See* FCC Rule 90, Subparts F and I [Exh. 2]. If they are not, then they cannot be legally operated here.

On July 16, 2008, DPS announced it was awarding the Contract on this RFP to Redflex Traffic Systems ("Redflex"). In its performance on that Contract, Redflex will be providing a mobile unit that uses a radar system that is *not* FCC approved and certified (*i.e.* violates federal law), something it has already been doing under another contract with DPS for many months, making Redflex's bid non-responsive. Redflex's bid should be deemed non-responsive on this basis alone.

899 1330.1

Snell & Wilmer is a member of LEX MUNDI, The Leading Association of Independent Law Firms.

**ATS00034**

CONFIDENTIAL

Snell & Wilmer
———— L.L.P. ————

August 4, 2008
Page 2

Even if Redflex was not using an illegal Radar system (it is), DPS should also sustain ATS's bid protest because:

- DPS's decision not to reopen the RFP process after the Arizona Legislature made substantial changes to the underlying photo radar statutes (and to bid specifications) without giving the parties an opportunity to submit additional materials was improper; and

- A significant number of incorrect and improper determinations were made in grading the bids submitted related to the RFP, and the determinations are as a matter of law arbitrary and capricious.

As a result, DPS has abused its discretion and this award must be reversed.

Finally, pursuant to A.A.C. R2-7-902(C), DPS should issue a Stay on the underlying Contract. The Stay should issue immediately and remain in effect until this protest (including the Complaint that has been filed in Maricopa County Superior Court) is resolved.

I.     **ATS is the Only Responsive, Responsible Bidder Because the Materials it Proposed to Provide Comply with All State, Federal and Local Laws.**

In 2007, Redflex submitted a bid for RFP No. L7-027, a pilot program to provide DPS with two mobile enforcement units for use in Arizona. These mobile enforcement units all used what is commonly known as "across-the-road" radar systems as an integral and necessary part of their speed monitoring system—without them, the systems would not be able to function. In its pilot program bid documents, Redflex touted the fact that its mobile units, the "REDFLEXspeed 2000M" system ("RedflexSPEED") was certified by the International Association of Chiefs of Police ("IACP"). As a clear condition of that IACP Certification, the IACP made clear that if any of the component parts that were necessary to operate the RedflexSPEED were changed, that the certification would be voided by any modifications not approved by the "original equipment manufacturer and the IACP." *See* IACP Certification, note 4 [Exh. 3].

Redflex also included with its bid photographs of the Radar system that Redflex used when it obtained the IACP certification, a Radar system known as the Robot/Multinova 6F DSR 2/3 (the "Multinova Radar"). That unit is a cone-shaped parabolic antenna that is easily discernable from other antennas because of its shape. *See* Photo of Multinova Radar, Redflex Bid Documents at 125, 128-29 [Exh. 4]. The Multinova radar that Redflex featured in obtaining its IACP certification and **in its bid documents** is manufactured by Robot Visual Systems, a German company, and is FCC certified (though ATS is uncertain if Redflex has obtained an FCC License to use it as the importer of record). The IACP certification states, clearly, that if any component part of the unit (including the Radar) changes, the certification is no longer valid and must be obtained with the new component parts. *See* IACP Certification at 2 [Exh. 3].

8991330.1                                     2

**ATS00035**

**CONFIDENTIAL**

Snell & Wilmer
——L.L.P.——

August 4, 2008
Page 3

On January 11, 2008, DPS published the RFP, which was subsequently amended on February 18. [Exh. 1]. The RFP states clearly that "Compliance With Applicable Laws. The Contractor shall comply with all *federal, state and local laws regarding the materials and services supplied under the Contract and shall maintain all applicable licenses and permits.*" *See* Exh. 1 at 19 (Section 7.5--Uniform Terms and Conditions) (emphasis added). To be a responsive bidder, a party had to provide materials that comply with federal law. *See also* A.R.S. § 41-2637. Bidders must also warrant that any materials that will be provided under the RFP are "of a quality to pass without objection in the trade under the Contract," "[f]it for the intended purposes for which the materials are used," and "fit for all purposes and uses required by the Contract." *See* Exh. 1 at 18 (Section 7.2 & 7.3 -- Terms and Conditions) (Sections 7.2, 7.3 & 7.5 will be collectively referred to herein as "Section 7").

On March 10, 2008, ATS and Redflex submitted proposals to DPS on the RFP. Redflex's proposal again promoted its IACP certification and included photos of the Multinova Radar system. [Exh. 4] Redflex also indicated that it had reviewed the terms of the RFP and that its submission complied with all of the requirements, including RFP Section 7. *See* Redflex Offer and Acceptance at 3 [Exh. 4]. As a bidder on a public procurement project, Redflex warranted that there were no material or otherwise substantial misrepresentations in its bid proposal. *Id.*

Despite this, and despite its prior representations to the contrary, Redflex has been performing under the DPS pilot program, and upon information and belief intended to perform on the RFP, by using mobile speed enforcement units that do *not* use the Multinova Radar, but instead use the AGD-340 Traffic Detector Radar system ("AGD-340"). Simply changing the Radar system, which invalidates the IACP certification that Redflex touts, without telling DPS constitutes a material misrepresentation on its bid that should invalidate Redflex's bid.

More importantly, however, the real problem with this element of Redflex's bid is that the Radar unit it does plan to use is not FCC type-approved and certified and thus is not legal for use in the United States. Specifically, the Radar system on the Redflex vehicles that have been deployed in Arizona (and other states) for the past 12 or so months have operated using an easily recognizable Radar unit called the AGD-340, which is manufactured by a British company and easily distinguishable from the Multinova Unit (or other similar units) because it is rectangular. *See* Photos of Redflex DPS Units [Exh. 5]. The AGD-340 is *not* FCC type-approved and certified, meaning it is *illegal* to use the device in the United States, and anyone who does is violating the federal law. *See* FCC Rule 90, Subparts F and I [Exh. 2]. The radiolocation transmitters required by the RFP must meet certain technical requirements *and receive certification from the FCC before the can be used in the United States. Id.* at Subpart I, (a) and (d). ("...each transmitter utilized for operation...must be of a type which has been *certificated for use under this part.*") (emphasis added).

8991330.1                                      3

CONFIDENTIAL

ATS00036

Snell & Wilmer
———— L.L.P. ————

August 4, 2008
Page 4

On May 29, 2008, ATS informed DPS the units Redflex was using in the pilot program were not IACP certified (ATS did not know at that time that it was not FCC certified). DPS dismissed ATS's notice and failed to *consider* this misrepresentation either in administering the pilot program or grading Redflex's proposal on the RFP. *See* DPS Letter to ATS rejecting "bid protest" (June 4, 2008) [Exh. 6]; DPS Grade Sheets [Exh. 7].

In June 2008, the Governor signed into law revisions to A.R.S. § 28-1593 and A.R.S. § 41-1722 that materially impact the RFP.

On July 16, 2008, without having conducted any follow up with either bidder, asked for an inspection of their facilities or seeking clarification on any issue raised by the bid documents, DPS announced it was awarding the Contract to Redflex.

On July 17, ATS requested DPS's file to determine if a bid protest was appropriate and was told the file would not be available for 10 to 20 days.

On July 18, 2008, ATS retained counsel and notified DPS's counsel of its request for the entire bid file. [Exh. 8]. DPS provided a copy of part of the file to ATS on or about July 23, 2008, but it was incomplete.

On July 24, ATS again notified DPS that DPS had not provided the entire file and requested that, as a result, DPS granted ATS an extension to file its bid protest. ATS further requested DPS stay any further activity on issuing the Contract to allow it to protest. On July 24, DPS granted the extension request. [Exh. 9].

On July 24, ATS received the entire file and determined that at least three separate grounds exist for a bid protest:

1.   Redflex is importing, marketing and using an illegal Radar system that it failed to disclose to DPS when it submitted its Bid Proposal, rendering its bid non-responsive;

2.   DPS failed to re-open the bids, despite the substantive change in the underlying statute controlling the entire process, in violation of long-standing procurement laws; and,

3.   There were numerous errors of fact and law related to DPS's findings in the RFP that constituted a clear abuse of discretion by DPS, requiring that the Project be at a minimum rebid.

For these reasons, ATS respectfully requests that DPS determine Redflex to be a non-responsive, non-responsible bidder and award the contract to ATS. At mimimum, DPS must reopen this

8991330.1                                            4

**ATS00037**

CONFIDENTIAL

Snell & Wilmer
——— L.L.P. ———

August 4, 2008
Page 5

RFP and seek clarification, through a formal process, related to the underlying issues raised in this bid protest before awarding the Contract here to any party. Finally, DPS should grant a stay related to this procurement until this protest is resolved.

**II.     ATS's Bid Protest Should Be Sustained Because Redflex's Mobile Units Rely on an Illegal Radar System, Redflex Did Not Disclose this Fact to DPS, and Therefore Redflex's Bid is Non-Responsible and its Bid Non-Responsive. D.**

A vital component of any photo radar system is the Radar system itself. Licensing of Radar Systems is controlled in the United States by the Federal Communications Commission ("FCC"), and specifically by Rule 90 published by the FCC, regarding licensing of radiolocation transmitters. *See* FCC Rule 90, Subpart F and I [Exh. 2]. The Radar Systems required by the RFP here, "across-the-road" Radar, must meet certain technical requirements *and receive certification* from the FCC *before* the units can even be marketed, let alone operated (i.e. turned on) in the United States, let alone actually deployed in the field. *Id.* at Subpart I, (a) and (d). ("…each transmitter utilized for operation…must be of a type which has been *certificated for use under this part.*") (emphasis added). For purposes of the RFP, this means any mobile units Redflex or any other bidder intended to use in providing equipment related to the RFP must use FCC type-approved and certified Radar systems to be in compliance with applicable federal laws. *See* Exh. 1 at pg. 19, § 7.5; Exh. 2. If they did not, then the bid is non-responsive. *See id.*

In bidding on both the Pilot Program and this RFP, Redflex had represented to DPS, through photos included in its bid documents, that Redflex's mobile units use the Multinova Radar system. *See* Multinova Radar [Exh. 4]. This Multinova system is FCC certified and was used by Redflex when its mobile units were "IACP certified". [Exhs. 3, 4]. However, in reality, Redflex has not, when working for DPS, and will not, on a going-forward basis, use the Multinova Radar on its vehicles. Instead, Redflex has, for the entirety of the pilot program, deployed the rectangular-shaped AGD 340 Radar that is *not* FCC type-approved or certified. *See* Photos of Redflex Mobile Units Deployed by Redflex on July 28, 2008 in Arizona on behalf of DPS [Exh. 5]. In fact, ATS can provide DPS with extensive evidence, photographic and video, demonstrating Redflex has utilized the AGD-340 Radar in multiple states in the U.S. for a substantial period of time, even though the AGD-340 is not FCC certified and therefore not legal for use in the United States. Indeed, ATS is informed and believes it will be able to show Redflex ordered at least *fifty* (50) AGD-340 Radar systems. Thus, Redflex is proposing to provide equipment to DPS that does not comply with federal law, rendering its bid non-responsive. *See Brown v. City of Phoenix*, 77 Ariz. 368, 373, 272 P.2d 358, 362 (1954).

The consequences of using a non-FCC approved Radar could be disastrous. ATS is informed the FCC has previously fined operators of illegal radar transmitters up to *$11,000 per day*. More importantly, the use of Radar systems that are not FCC approved as a method to try and enforce the legality of traffic laws is not appropriate. Every ticket that DPS issues, and

ATS00038

CONFIDENTIAL

Snell & Wilmer
——— L.L.P. ———

August 4, 2008
Page 6

every dollar collected using non-FCC approved Radar on Redflex's mobile vehicles is challengeable as improper under federal law.  Those fines may (and likely will) have to be refunded.

For "across-the-road" speed measuring devices, there are currently only four type-approved and FCC certified Radar systems in the world: the Gatsometer (Dutch); the Multinova Radar; the Sensys AB (Sweden); and the American Traffic Solutions (USA) radar.  All four of these Radar systems are manufactured by direct competitors of Redflex, and therefore none of them will sell Redflex an FCC approved model.[1]  Unfortunately, an inability to obtain an FCC approved and certified Radar System does not justify Redflex's use of the AGD-340.  It instead renders Redflex's bid non-responsive.  DPS cannot consider a bidder responsive when that bidder: (1) knowingly misrepresents what equipment it will provide in performing on multiple state contracts; (2) fails to provide equipment that complies with federal law; (3) violates federal law in providing services to a law enforcement entity; and (4) subjects the State of Arizona to the type of liability Redflex has done here. *See Ruelas v. Ruelas*, 7 Ariz.App. 98, 101, 436 P.2d 490, 493 (1968) ("Generally, an agreement which cannot be performed without violating applicable law, is illegal and void."); *Caci, Inc. v. P.W. Stone*, 990 F.2d 1233, 1235 (Fed. Cir. 1993) (holding procurement contract void and invalid when illegality is clear); A.R.S. § 35-154(A).

Indeed, the true irony of this is highlighted by one of the things Redflex says in their bid proposal: "[o]ne thing that the DPS and state can be certain of is there will continue to be intense scrutiny and debate around automated enforcement." *See* Redflex Bid Documents, p. 22. Redflex is right—automated enforcement systems have been and will continue to be controversial—and their use will be scrutinized heavily.  Thus, it is imperative that the system being deployed by DPS here be not only cost effective, but beyond reproach.  Using a Radar system that is illegal in the United States does not meet that criteria, and will provide motorists charged with a built-in ground for disputing each ticket that is issued.  Indeed, every ticket already issued by the Redflex units with the AGD-340 Radar unit can, if ATS is correct about the lack of FCC certification, likely be challenged successfully in Court.

The fact Redflex is a non-responsive bidder also matters because DPS was on notice of this potential issue and failed to consider it in scoring Redflex's bid proposal.  DPS was told on May 28, 2008, that Redflex's mobile units were using the AGD-340 Radar system, rather than the Multinova system that was used when Redflex obtained its IACP certification, and that as a result the units were not IACP approved.  DPS's failure to follow up with Redflex and determine

---

[1]  ATS is informed and therefore believes that at least part of the reason Redflex is deploying a non-FCC certified radar system is that it is unable to obtain one that is FCC approved.  Multinova's manufacturer, Robot Visual Systems has a United States subsidiary, Traffipax, which competes with both Redflex and ATS. *See* Exh. 10. ATS has recently learned that at some point in the last two years, Robot Visual Systems made a business decision to stop selling the Multinova radar to Redflex, because Redflex was a competitor.

8991330.1                                6

ATS00039

**CONFIDENTIAL**

Snell & Wilmer
——L.L.P.——

August 4, 2008
Page 7

whether Redflex has, in fact, had its new Radar system IACP approved (let alone FCC approved), constitute a clear abuse of discretion, especially for a law enforcement agency. *See Brown.* DPS's failure to consider this issue in any way in grading Redflex's proposal renders the Contract to Redflex is simply improper. *See id.*[2] DPS was required to at least inquire about the Radar system, it failed to do so, increasing its culpability.

Indeed, if, as ATS believes, Redflex is in fact operating with an illegal radar system that does not comply with FCC regulations, and if DPS continues to go forward and contract with Redflex despite knowing of this illegality, *DPS, along with each and every individual at DPS authorizing such a contract, may be jointly and severally liable for any payments made to or damages caused by Redflex* pursuant to A.R.S. § 35-155(B) and A.R.S. § 35-211, as well as subject to criminal penalties pursuant to A.R.S. § 35-197. DPS must reject Redflex's proposal and enter into a contract with the only responsive and responsible bidder here, ATS.

**III.   Even if Redflex's Radar System Complied with Federal Law, This Project Should Have Been Rebid Because The RFP Conflicts with Recently Passed Legislation.**

The purpose of the competitive bidding statute is to prevent favoritism, fraud, and public waste by encouraging free and full competition. *See Mohave County v. Mohave-Kingman Estates, Inc.*, 120 Ariz. 417, 420, 586 P.2d 978, 981 (1978). Public authorities cannot undermine competitive bidding by contracting with the selected bidder for terms which were not included in the bidding specifications. *Id.* Changes to governmental requirements can require an amendment or a cancellation of an RFP:

> Generally, where the government's requirements change after RFP issuance, it must issue an amendment to notify offerors of the changed requirements and afford them the opportunity to respond...[i]n our view, the changes identified by [the protestor] constitute a significant change from the RFP requirements such that the issuance of an amendment soliciting revised proposals is required...[w]e think that these departures of the government's actual requirements from those that formed the basis for the competition are so significant that the selection can no longer be said to be based upon full and open competition.

*See Matter of United Telephone Co. of the Northwest*, B-246977, 92-1 CPD P. 374 at 6, 7 (Comp.Gen.1992).[3]

---

[2]    And this does not even consider how DPS would have graded Redflex had they, in fact, disclosed the fact that they could no longer provide the mobile units because they could no longer use the Multinova Radar System, and thus were going to be using a non-FCC approved or certified Radar. Had Redflex told the truth, ATS would clearly have been awarded the Contract.

[3]    In the absence of controlling state authority, Arizona courts look for guidance in public contract law to the Federal Court of Claims and the Federal Boards of Contract Appeals. *New Pueblo Constructors, Inc. v. State*, 144 Ariz. 95 (1985).

8991330.1                                          7

ATS00040

CONFIDENTIAL

**Snell & Wilmer**
—— L.L.P. ——

August 4, 2008
Page 8

Here, the Legislature amended A.R.S. § 28-1593 and A.R.S. § 41-1722 after the RFP's closing date of March 10, 2008, materially changing the RFP in five ways. First, the Legislature established a new framework for allowing the issuance of Notices of Violation ("Notices") prior to filing court citations that will result in significant savings related to processing costs, impacting bid price.

Second, this new framework will result in lower costs for every mailed Notice as the former framework required a pre-paid return envelope to be enclosed with each Notice. *See* RFP Scope of Work § 8.3.

Third, Subsection "E" directs the Arizona Supreme Court to establish rules governing the issuance, service and processing of Notices. These rules cannot be addressed until they are adopted, and they have not yet been adopted. DPS should not, for expediency's sake, require bidders to guess what their costs will be based on rules that have not yet been promulgated. Fourth, the revised legislation provides for a single $165.00 flat fee for any photo enforcement offense. Fifth, the Legislature removed the statute that indicated any ticket would add points to a violator's license. *See* A.R.S. § 41-1722. These changes will make it easier to administer the program and increase the number of fines paid, changing the material issues that bidders must consider on the Project.

Fourth, the revised legislation provides for a single $165.00 flat fee for any photo enforcement offense. Fifth, the Legislature removed the statute that indicated any ticket would add points to a violator's license. *See* A.R.S. § 41-1722. These changes will make it easier to administer the program and increase the number of fines paid, changing the material issues that bidders must consider on the Project.

Given these changes, DPS was required to amend the RFP to allow the parties to submit revised bids. *See* Uniform Terms and Conditions § 5. DPS failed to do so, awarding the entire Contract to Redflex. As set forth in *Mohave County* and *Matter of United Telephone Co. of the Northwest,* DPS cannot circumvent the competitive bidding process in this manner. The RFP should be re-opened or cancelled outright.[4]

**IV    DPS's Failure to Conduct Any Interviews, Inspect Facilities, or Independently Verify Any of the Information (or, in Redflex's Case, Misinformation) Provided in the Bid Responses Before Awarding the Contract Constitute an Abuse of Discretion.**

---

[4]    ATS is also informed and believes DPS has made an additional material change to the RFP requirements, in that it has determined that tickets will now issue for each vehicle found to be 10 MPH over the speed limit, rather than the 11 MPH customarily required by DPS on the 101 Freeway program. While this may seem trivial, this change will have a major impact on the underlying assumptions that each bid is based upon, possibly increasing the number of citations by as much as 40%. Clearly, this material change should have been disclosed before any Contract was entered.

8991330.1                                                8

ATS00041

CONFIDENTIAL

# Snell & Wilmer
#### — L.L.P.—

August 4, 2008
Page 9

Even if Redflex was a responsive bidder here (it is not), DPS's award of the Contract to Redflex is still clearly erroneous and an abuse of discretion because most, if not all, of DPS's determinations in grading the bids were wrong. *See Brown v. City of Phoenix*, 77 Ariz. 368, 373, 272 P.2d 358, 362 (1954). During the procurement process, DPS determined it would handle this procurement through an RFP (rather than an IFB) for three reasons: (1) an RFP would allow for negotiations with bidders related to technical specifications and price issues; (2) an RFP would permit bidders to revise their offers or provide additional information to answer questions for DPS on technical issues; and (3) an RFP would allow DPS to evaluate the quality and other services offered by the potential bidders. *See Himmelstein Memo to File* [Exh. 11]. The corollary to this determination is that by opting to use the RFP process, DPS was obligating itself to conduct the necessary inquiries to ensure that the entity it contracts with is, in fact, the best offeror based upon the criteria *listed in the specifications* as important. *See id.*.

Given this, DPS's decision to award this Contract to Redflex abuses its discretion in at least four ways: (1) DPS used criteria for grading that were not listed as relevant to the RFP in the RFP documents, essentially cherry-picking issues that favored Redflex over ATS from Redflex's materials, in a clearly arbitrary and capricious manner; (2)DPS's grade sheets include numerous factual errors that impact ATS's scoring unfairly; (3) DPS failed to verify a number of claims made by Redflex in its bid proposal, or seek clarification from ATS about statements made by Redflex regarding ATS, improperly favoring Redflex; and (4) DPS personnel lacked the technical understanding necessary to understand the significance of certain claims, invalidating the determinations. *See DPS Grading Sheets* [Exh. 7].

Each of these issues, by itself, constitutes an abuse of discretion—together they mandate invalidating DPS's award to Redflex, even if it was a responsive bidder (it is not). DPS should award the Contract to ATS as the **only responsive and responsible bidder.**

### A.  DPS Abused its Discretion By Making Determinations Based on Criteria that Were Not Part of the RFP.

The Arizona Procurement Code dictates that awards must be based upon the factors *set forth in the request for proposals*. *See* A.R.S. § 41-2534(G); A.A.C. R2-7-C317. "[A]ny factor which significantly contributes to how a potential offeror structures its proposal or which affects the selection of an awardee *should be disclosed in the solicitation*." *See Systems Resources, Inc. v. Department of the Navy*, 94-1 BCA P 26388 (1993) (emphasis added). Procurement law also holds "[i]t is fundamental that offerors be advised of the bases upon which their proposals will be evaluated" and that contracting officials "do not have the discretion to announce in the solicitation that they will use one evaluation plan and then follow another without informing offerors of the changed plan and providing them an opportunity to submit proposals on that basis." *See Matter of Kessler, Inc.*, B-284693, 2000 CPD P96 (Comp.Gen. 2000) at *2. These

8991330.1                                        9

ATS00042

**CONFIDENTIAL**

Snell & Wilmer
———L.L.P.———

August 4, 2008
Page 10

basic tenets ensure all proposers can "compete on an equal basis" to prevent favoritism, fraud, and public waste and encourage free and full competition. *Id; see also Mohave County.*

Here, Redflex was awarded points based on criteria that were not part of the RFP, rendering DPS's determinations an abuse of discretion. For example, DPS gave Redflex points becaue Redflex said it could provide walk-in facilities related to Arizona residents to pay their fines. *See* Exh. 7 at pg. 2. Provisions for a walk-in facility *were not a part of the RFP's scope of work requirement*, and DPS did not seek clarification from ATS on its ability to provide walk in facilities during the RFP evaluation. ATS is not required to guess what DPS might, or might not, consider important later—it is entitled to rely upon the stated criteria in the RFP. Moreover, if DPS had requested this information, DPS would have learned that ATS has multiple facilities located within metro Phoenix that could serve as walk in facilities. Giving Redflex "extra credit" for information included in its bid documents outside the scope of the RFP is an abuse of discretion. *See id.*

Similarly, DPS awarded Redflex extra points due to Redflex's claims of an average service factor of 95% in their call center and minimal customer service telephone wait times. *See* Exh 7 at pg.2. *Call center performance metrics were not requested as part of the RFP*. If DPS felt call center metric performance was important and/or material to the RFP, DPS was required to request additional information regarding this performance in order to provide an even playing field to all proposers. *See Matter of Kessler*.[5] DPS did *not* do so, and then failed to seek any clarification from ATS on its call center capability during the RFP process. This is an abuse of discretion.

**B.    DPS Abused its Discretion By Making Material Errors of Fact in its Grading Process.**

Similarly, determinations by a public agency that lack a rational basis and/or are clearly erroneous are, as a matter of law, unreasonable and subject to protest. *See Matter of SDA Inc.*, B-248528, 93-1 CPD P320 (Comp.Gen. 1993). In other words, the fact that DPS's determinations on this procurement are factually untrue constitutes an abuse of discretion that justifies upholding a bid protest. *See id.*

For example, item 6.1.2 of DPS's sheet indicates ATS only has experience with witnesses on "stationary" equipment. This is untrue—ATS's bid demonstrated it could provide all

---

[5]    Moreover, had DPS conducted any due diligence with respect to Redflex's claims on this issue, rather than accepting the statements at face value, it would have learned that the promotional materials were largely puffing. Over the past few weeks, ATS staff made dozens of calls to Redflex's inbound call center over multiple business days. On average, Redflex representatives answered calls in approximately three minutes of connecting with the center as opposed to 20 seconds as stated in the proposal with wait times as long as 13 minutes.

8991330.1                                    10

ATS00043

CONFIDENTIAL

Snell & Wilmer
——— L.L.P. ———

August 4, 2008
Page 11

adequate staffing necessary to testify on any issue required by the materials and equipment it would be providing DPS, including mobile systems. ATS did not provide a resume for someone who would testify on mobile systems *because there was no request for resume's from all potential witnesses* in the RFP. Had DPS made such a request, ATS would have provided it. For DPS to give points to Redflex based on a factually untrue assertion is improper. *See id.*

Similarly, in evaluating the "Experience/capabilities" of the bidders, DPS erroneously states at item 6.3.1 that ATS's "Financial Report is not audited." This is simply untrue, the financial statements ATS provided was audited.[6]

And, on item 6.3.4, DPS indicates ATS has only had experience providing "fixed systems on urban freeways within Arizona." *See* Exh. 7 at pg. 5. This is simply wrong, and DPS knows it is, as ATS has deployed both stationary and mobile units in Arizona. *See* ATS bid Proposal at 178-79 [Exh.12]. DPS cannot make false determinations in grading bid proposals on an RFP and then rely upon them in making an award. This is an abuse of discretion.

   **C.    DPS Abused its Discretion By Failing to Verify and/or Clarify Terms from the Bid Documents, or Giving the Bidders a Chance to Address Alleged Concerns Regarding Those Bid Documents.**

As DPS knows, bid responses to an RFP are, to some extent, marketing materials—they highlight issues a potential bidder believes support their bid. Claims made in such circumstances must be taken by a contracting agency with a grain of salt. Clearly, an agency that accepts such claims as truth on their face in evaluating an RFP has failed to exercise its discretion in an appropriate way, as there is no way to verify the truth of those claims based simply on the fact that they are listed in an RFP.

Here, DPS awarded points to Redflex on a number of issues that clearly were just regurgitations of what Redflex said in its bid documents. For instance, DPS made a finding that Redflex video system could record 24 seconds of video, and contrasted that with ATS's video system, indicating ATS's system could only record 12 seconds. See Exh. 7 at pg. 3. This is simply untrue. Redflex's proposal only states that Redflex's system could record *up to* 24 seconds, not that it will record 24 seconds for every capture. Similarly, ATS's system is configurable to record any number of seconds of video capture and exceeds the stated RFP requirements by a full seven seconds. For DPS to accept Redflex's representations without seeking any clarification from ATS effectively benefits Redflex to the detriment of ATS without conducting a reasonable inquiry. This is improper.

Similarly, DPS awarded points to Redflex for its unverified and self-serving statement that its cameras are better suited to Arizona's climate. The RFP ***did not request temperature***

---

[6] ATS provided a copy of audited financial statements with its proposal and will provide an additional copy to DPS upon request.

8991330.1                                          11

ATS00044

CONFIDENTIAL

**Snell & Wilmer**
L.L.P.

August 4, 2008
Page 12

*specifications as part of the RFP requirements*.  If DPS would have requested additional information on this point, DPS would have learned that ATS cameras do not suffer from heat related problems as insinuated by the Redflex proposal.  ATS has not had a single heat-related camera malfunction using its Nikon-based system.  In fact, during the entire year long period in which ATS operated cameras for DPS on the 101, not a single camera failure, environmental incident, or vandalism incident occurred.  DPS, however, did not seek any clarification from ATS on whether heat would have any effect on the ATS system during the evaluation, instead relying on Redflex's bald statements set forth in its promotional materials.[7]  This is an abuse of discretion.

> **D.    DPS Determinations Related to Various Techincal Issues were Arbitrary and Capricious Because the DPS Personnel Either Lacked, or Failed to Apply, the Technical Expertise Necessary to Make the Evaluation.**

Awards based on evaluations performed by unqualified persons are *arbitrary and capricious* if that evaluation affects the outcome of the procurement,.  *See Knaus Sys., Inc. of Fla., v. Dept. of Children and Family Servs.*, No. 99-1230BID (Fla. Div. Admin. Hr'gs 1999).  Here, DPS made a number of "determinations" related to technical issues with no factual basis, other than perhaps a preference for Redflex.  For instance, DPS erroneously determined that public key infrastructure (PKI) is somehow superior to 3DES encrypted VPN internet links.  See Exh. 7 at pg. 3.  There is absolutely no basis for this determination, other than that Redflex says its system is superior.  Moreover, the two items compared by DPS are unrelated, and thus DPS's finding PKI is somehow "superior" to 3DES is unsupportable as a matter of law.  DPS failed to conduct any type of inspection of the ATS facility to evaluate security, let alone evaluate the security of the computer networks.  *See Knaus.*

DPS also awarded points to Redflex because of Redflex's use of OC3 data circuits, noting that ATS proposed dual 15 MB internet links that "may not be sufficient for the larger volume required for a large statewide program."  See Exh. 7 at pg. 3.  DPS's findings are incorrect.  ATS has 100 megabit infrastructure as indicated on page 72 of its proposal.  *See Exh. 14.*  ATS only utilizes 15 of the possible 100 Mb infrastructure, and thus has more than enough capacity to manage the entire state program.  Someone familiar with this type of technology would know that an OC3 circuit has only marginally greater capacity than a 100 Mb Circuit.  DPS's failure to understand key terminology, along with its failure to request additional information to clarify any confusion on its part, demonstrates DPS regarded Redflex materials as a definitive guide on Redflex (and ATS) technology in lieu of conducting its own due diligence and understanding these technical issues for itself.  This is an abuse of discretion. *See Knaus.*

---

[7]    Ironically, Redflex's proposal fails to mention that Redflex in fact uses Nikon cameras for a large number of its installations.  See Exh. 13 (Redflex camera after knockdown in Longview, Texas).

ATS00045

CONFIDENTIAL

Snell & Wilmer
———— L.L.P. ————

August 4, 2008
Page 13

These examples cited above, as well as others set forth in the attached table [Exh.15], demonstrate DPS acted in an arbitrary and capricious manner in scoring the RFP. DPS undermined the competitive bidding process by awarding points for non-existent RFP specifications and incorrect factual determinations. DPS did not provide an equal playing field on which ATS's proposal was judged. ATS's bid protest should be sustained.

**V.      Conclusion**

For the reasons set forth above, ATS respectfully requests that DPS sustain ATS's bid protest, disqualify Redflex as a non-responsive and non-responsible bidder, and award the proposal to ATS. Further, ATS requests that DPS and/or DOA grant a stay related to this procurement pending the outcome of this protest.

Very truly yours,

SNELL & WILMER

Joshua Grabel

cc:      Brian D. Schneider, Attorney for DPS (via email)
         Anni Foster, Attorney for DPS (via email)
         Joe Acosta, Attorney for DPS (via email)
         Brian Luse, Attorney for DOA (via email)
         Craig Berk, Attorney for Redflex (via email)

ATS00046

CONFIDENTIAL

# Snell & Wilmer
### L.L.P.
##### LAW OFFICES

One Arizona Center
Phoenix, AZ 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

Joshua Grabel
602-382-6280
jgrabel@swlaw.com

August 5, 2008

**VIA EMAIL**

Rex Martin, Procurement Officer          Jean A. Clark, State Procurement Officer
Lu Himmelstein, Chief Procurement Officer    Dept. of Administration
Dept. of Public Safety                   Arizona Department of Administration
2102 West Encanto Blvd.                  100 North 15th Avenue, Suite 104
PO Box 6638                              Phoenix, AZ 85007
Phoenix, AZ 85005-6638

      Re:    **Bid Protest for Solicitation L8-022, Statewide Traffic Photo/Speed &
              Intersection Enforcement Systems, Mobile and Fixed
              Request for Additional Documents;
              Clarification of Issue Raised in DPS's Pleadings; and,
              Protest Related to DPS Solicitation L7-027**

To Mr. Martin, Ms. Himmelstein and Ms. Clark:

      As you know, ATS filed a bid protest DPS RFP L8-022 ("the RFP") and requested a stay related to pending resolution of the bid protest. Given the accelerated schedule proposed for the Contract, ATS respectfully requests DPS and DOA act in as expeditious a manner as possible to consider ATS's request for Stay.

      **Request for Documents.** ATS also requests DPS provide ATS any documents related to this procurement file that have not already been made available, including the Notice to Proceed and the Contract entered by the Parties. Please let me know when these documents are available.

      **DPS's Interpretation of ATS's Bid Documents is Incorrect.** Additionally, ATS wants to address an argument DPS made in its Response to ATS's Motion for Temporary Restraining Order. DPS contends that ATS is "not arguing that the proposal submitted by Redflex is invalid, rather ATS is arguing that Redflex may not be able to perform." *See* Response at 6. This is not ATS's position. ATS has demonstrated that Redflex could not, at the time it submitted its bid, provide a radar system for its mobile units that is FCC type-approved and licensed. *See* ATS Bid Protest at 5-7. Moreover, ATS has demonstrated Redflex has, for the past 12 months, been operating a mobile unit for DPS that uses a non-FCC type-approved and licensed Radar system in Arizona, even though this system violates federal law. *See* ATS Bid Protest at 5-7. ATS is not arguing Redflex a performance issue, ATS is arguing Redflex has not provided the state with

\GRABELJ\SWDMS\8996803

Snell & Wilmer is a member of LEX MUNDI, The Leading Association of Independent Law Firms.

ATS001253

CONFIDENTIAL

# Snell & Wilmer
L.L.P.

August 5, 2008
Page 2

FCC compliant systems, did not intend to do so on this Contract, and thus Redflex is not a responsive or responsible bidder. *See* ATS Bid Protest at 5-7. DPS cannot accept a bid or enter a contract with a bidder who is not able to supply FCC compliant equipment at the time of bid (or time of Contract, which was July 28, 2008), even if that supplier may, eventually, find equipment that is FCC compliant.

DPS also contends that "[ATS's] own bid states on page 93 of its proposal that its 'radar systems have been designed and tested to meet IACP standards and *will be approved and certified if ATS is selected*." *See* DPS Response at 6 (emphasis in original). DPS is misreading ATS's bid documents. ATS's radar system is, and has for at least the last 10 years, been FCC type-approved and licensed. The statement DPS quotes relates to whether ATS's equipment is *IACP certified*, not whether ATS's Radar system is an FCC type-approved and licensed Radar system. FCC licensing is required to *offer for sale*, turn-on, operate or use a Radar system in the United States—IACP certification is not. *See* FCC Rule 90. ATS's statement in its bid documents was that, *at the time it submitted a bid*, its system was not IACP certified. It is now. It is not, as DPS contended, an admission *FCC* type-approval and licensing were not required to bid on this RFP. By contrast, Redflex's failure to have *FCC* approval/licensing before offering equipment for sale to DPS renders Redflex's bid non-responsive. *See* ATS Bid Protest at 5-7.

**ATS Also Protests Redflex's Award of Contract Under RFP No. L7-027.** As DPS knows, in 2007 Redflex was awarded a pilot program to provide DPS with two mobile enforcement units for use in Arizona under DPS Procurement L7-027. As a condition of that bid, Redflex was required to provide equipment that complied with all federal, state and local laws regarding the materials and services supplied under the Contract. (emphasis added). Redflex has, as ATS has demonstrated in its bid protest related to L8-022, been operating mobile units that use an AGD-340 Radar system that is not FCC type-approved and licensed. *See* ATS Bid Protest at 5-7 (incorporated herein as if fully stated); Photos of Redflex Mobile Units Deployed by Redflex on July 28, 2008 [Exh. 5].

Redflex's award under L7-027 should be revoked because Redflex is operating mobile units in Arizona (for DPS) with Radar systems that are not FCC compliant, in violation of federal law. ATS also asserts that DPS and DOA must also consider how revocation for illegal performance under L7-027 impacts the award of L8-022, and contends it makes awarding to Redflex inappropriate as a matter of law.

Very truly yours,

SNELL & WILMER

Joshua Grabel

\GRABEL\SWDMS\8996803

2

ATS001254

CONFIDENTIAL

# Snell & Wilmer
### L.L.P.

August 5, 2008
Page 3


cc:   Brian D. Schneider, Attorney for DPS (via email)
      Anni Foster, Attorney for DPS (via email)
      Joe Acosta, Attorney for DPS (via email)
      Brian Luse, Attorney for DOA (via email)
      Craig Berk, Attorney for Redflex (via email)

ATS001255

CONFIDENTIAL

 **American Traffic Solutions**

480.368.0900 • Fax: 480.607.0901 • www.atsol.com • 7681 East Gray Road • Scottsdale, Arizona 85260

August 7, 2008

Mr. Raymond A Laforge
Auditing & Compliance Branch Chief
Federal Communications Commission
Office of Engineering and Technology
445 12TH ST SW
Washington DC 20554

Re:     **Complaint re:**   Use and Sale of Non-Type Accepted Radiolocation Transmitter Device and Request
                          for Finding of Non-Compliance by FCC

Dear Mr. Laforge:

Redflex Traffic Systems ("Redflex") is a subsidiary of an Australian public company, Redflex Holdings Limited,
has been using a radar speed meter without a Grant of Authorization for Type Acceptance by the FCC.

Upon information and belief, Redflex is marketing and operating radar antenna systems on behalf of US state
and local government law enforcement agencies relating to photo traffic speed enforcement programs. The
radar units are manufactured and supplied to Redflex by a British company called AGD Systems Ltd. The radar
antenna unit is known as the AGD-340 Traffic Detector ("AGD-340"). Exhibit 6 shows the manufacturer's
specification. In searching the FCC database, we found the AGD-340 is not Type Accepted by the FCC, and is
not licensed for use here, and therefore we understand its use in the United States by Redflex to be a violation
of federal law. *See* Exhibit 2.

Despite this, Redflex is marketing and using the AGD-340 in the United States. Exhibit 1 presents a Redflex
marketing brochure that shows Redflex as selling the AGD-340. Exhibit 3 presents pictures of a Redflex photo
radar vehicle which was operated on US 60 in Arizona on July, 28 2008. The pictures were captured during the
active operation and clearly show that Redflex is using an AGD-340 radar device on behalf of the Arizona
Department of Public Safety. We believe this radar device to be unlicensed in the United States. Redflex has
been operating this system for at least 12 months. Upon information and belief, the FCC should be able to
confirm that the vehicle was deployed at the place and time shown in the pictures by contacting the Arizona
DPS and asking for that information. It is also believed that this device has been in use by Redflex in Gretna,
LA, Baker, LA, Paradise Valley, AZ and other US locations for some time.

These radar units transmit and receive radio waves in a bandwidth that is specifically regulated by the Federal
Communications Commission ("FCC"). *See* FCC Rule 90, Subpart F and I in Exhibit 4. Such a "Radiolocation
Transmitter Device," (also known as a traffic speed radar system) cannot be marketed for sale, sold or used in
the United States without being Type Accepted by the FCC. Other manufacturers offering similar devices have
applied for and obtained Grants of Authorization and Type Acceptance for such devices, and it is our
assumption that the AGD 340 must also be Type Accepted prior to being marketed for sale or used by Redflex
or any other entity. It is our understanding that Type Acceptance must be obtained and accepted under Part 90
or Part 15.

In addition, based on information and belief, as the *Importer of Record*, Redflex has illegally imported an
unlicensed radiolocation device. We understand that anyone who imports a device that is unlicensed by the
FCC is required to apply for a Temporary Grant of Authorization for a limited quantity of devices, for limited
purposes such as testing. This requires a Declaration and submission of FCC Form 740 (attached as Exhibit
5). According to Form 740, making a false declaration (or failure to file a FCC Form 740) subjects the Importer
to fines of up to $250,000 and/or up to 5 years imprisonment.

We request that FCC search its records to determine if Redflex filed a Form 740 Declaration at any time in
connection with the importation of the unlicensed device, AGD 340 and whether a Temporary Grant was given
by the FCC. Exhibit 6 shows the technical specifications of the AGD 340 Radar, which has been imported by
Redflex.

ATS002824

 Mr. Raymond A Laforge
August 7, 2008
Page 2 of 2

This letter is a Formal Complaint and request the FCC intercede and require Redflex to stop marketing, selling and using the illegal device until such time as Type Acceptance and licensing is granted by the FCC. We also request that the FCC enforce any penalties that may be due as a result of potentially illegal actions and use.

The contact details for Redflex Traffic Systems are as follows:

Statutory Agent                             Corporate Offices
Redflex Traffic Systems                     Redflex Traffic Systems
c/o National Registered Agents, Inc.        Ms. Karen Finley
Statutory Agent                             President / CEO
638 N. 5th Avenue                           15020 North 74th Street
Phoenix, AZ 85003                           Scottsdale, Arizona 85260

Thank you for your consideration on this matter. Please feel free to contact me directly at any time via telephone - (480) 596-4608, or email - philip.underhill@atsol.com

Sincerely,

**American Traffic Solutions, Inc.**

Philip Underhill
Vice President Project Delivery

cc: Mr. Jim Szeliga

# EXHIBIT 9

1   Don Bivens (#005134)
    Joshua Grabel (#018373)
2   Michael Yates (#024026)
    SNELL & WILMER L.L.P.
3   One Arizona Center
    400 E. Van Buren
4   Phoenix, AZ 85004-2202
    Telephone: (602) 382-6000
5   Attorneys for Appellant American Traffic
         Solutions, Inc.
6
7              ARIZONA OFFICE OF ADMINISTRATIVE HEARINGS
8                     DEPARTMENT OF ADMINISTRATION
9   AMERICAN TRAFFIC SOLUTIONS,          Case No. 08-0001 ADM
    INC.,
10                                       **NOTICE OF WITHDRAWAL**
                      Appellant,
11                                       The Honorable Diane Mihalsky
    v.
12                                       Hearing:  **March 2-6, 2009**
    ARIZONA DEPARTMENT OF PUBLIC
13  SAFETY,
14                    Respondent
15  REDFLEX TRAFFIC SYSTEMS, INC.,
16
17                 Real-Party-in Interest
18        As events have unfolded, the subject matter of this proceeding has been subsumed
19  by the scope of the proceeding currently underway in United States District Court for the
20  District  of Arizona,  Matter  Number 08-cv-02051-PHX-RJM.  Accordingly,  ATS
21  withdraws its Appeal and requests that the hearing currently scheduled for March 2-6,
22  2009 be vacated pursuant to AAC R2-19-111(3).
23        Dated January 8, 2009.
24                               SNELL & WILMER L.L.P.
25                          By
26                               Don Bivens
                                 Joshua Grabel
27                               Michael Yates
                                 One Arizona Center
28                               400 E. Van Buren
                                 Phoenix, AZ 85004-2202
                                 Attorneys for Petitioner ATS

9391343                          - 1 -

REDFLEX001027

1

**ORIGINAL** of the foregoing filed electronically
2   This 8th day of January, 2009 with the
Office of Administrative Hearings to:

3

Honorable Diane Mihalsky
4   Arizona Office of Administrative Hearings
1400 W Washington
5   Suite 101
Phoenix AZ 85007-2900

6

**COPY** of the foregoing emailed this same day to:
7

E. Jeffrey Walsh, Esq.
8   Greenberg Traurig LLP
2375 East Camelback Road
9   Suite 700
Phoenix AZ 85016
10   Attorney for Redflex

11   Anni Foster, Esq.
Joe Acosta, Esq.
12   Office of Attorney General
1275 W. Washington Street
13   Phoenix AZ 85007-2926
Attorneys for DPS

14

Brian Luse, Esq.
15   Office of Attorney General
1275 W. Washington Street
16   Phoenix AZ 85007-2926
Attorney for Department of Administration

17

18

19

20

21

22

23

24

25

26

27

28

9391343

- 2 -

REDFLEX001028

# EXHIBIT 10

 **American Traffic Solutions**

480.368.0700 • Fax: 480.607.0901 • www.atsol.com • 7681 East Gray Road • Scottsdale, Arizona 85269

August 12, 2008

Mr. Raymond A Laforge
Auditing & Compliance Branch Chief
Federal Communications Commission
Office of Engineering and Technology
445 12TH ST SW
Washington DC 20554

*Re:  Use and Sale of the Multanova DRS-3 Non-Type Accepted Radiolocation Transmitter
Device*

Dear Mr. Laforge:

Redflex Traffic Systems ("Redflex") a subsidiary of an Australian public company, Redflex Holdings
Limited, appears to have been using another radar speed meter without a Grant of Authorization for
Type Approval by the FCC.

Upon information and belief, Redflex is marketing and operating radar antenna systems on behalf of
US law enforcement agencies relating to photo traffic speed enforcement programs.  These radar
units are manufactured and supplied to Redflex by a German company called Robot Visual Systems
GmbH.  It is believed that the radar units known as the DRS-3 operate at a frequency range of
34200.0 - 34400.0 MHZ.  Comprehensive searches of the FCC website and database were unable
to identify evidence that the DRS-3 radar has been Type Accepted by the FCC.

Redflex is marketing and operating the DRS-3 radar in the United States, without FCC certification
and without any labels or markings showing an FCC ID.  Exhibit 1 presents pictures captured on
August 11, 2008 which shows two DRS-3 radar antennas mounted on a Redflex photo enforcement
vehicle operating in the City of Tempe, AZ.  Note that the close up pictures of the radar ID label
shows the German PTT Certification, but there is no FCC ID displayed.  Our understanding is that
none of the DRS-3 radars operated by Redflex display an FCC ID.  Redflex has been operating the
DRS-3 radars for many years in AZ, CO, OR, CA, NM, LA, OH, WA and other states.  The DSR-3
radar unit is also frequently marketed and displayed at trade shows including the International
Association of Chefs of Police.

These radar units transmit and receive radio waves in a bandwidth that is specifically regulated by
the Federal Communications Commission ("FCC").  *See* FCC Rule 90, Subpart F and I in Exhibit 2.
Such a "Radiolocation Transmitter Device," (also known as a traffic speed radar system) cannot be
marketed for sale, sold or used in the United States without being Type Accepted by the FCC.  Other
manufacturers with similar devices have applied for and obtained Grants of Authorization and Type
Acceptance for such devices and it is our assumption that the DRS-3 must also be Type Accepted
prior to being marketed for sale or used by Redflex or any other entity.  It is our understanding that
Type Acceptance for the DRS-3 radar must be obtained and approved under Part 90.  A certified
Redflex Radar Speed Camera Deployment Form is attached as Exhibit 4, which includes a
description of the Multanova 9F, which uses the DRS-3 as its radar detector.  Also attached is a
facsimile transmitted from Multanova to Redflex on November 1, 1996, which presents DRS-3 speed
accuracy specifications and Swiss Homologation (Swiss Type Acceptance) references for the radar.
Absent at that time was any reference to FCC Type Acceptance or Grants of Authorization.

ATS003115

**CONFIDENTIAL**

 Mr. Raymond A Laforge
August 12, 2008
Page 2 of 2

We understand that anyone who imports a device that is not Type Accepted and certified by the FCC is required to apply for a Temporary Grant of Authorization for a limited quantity of devices, for limited purposes such as testing. This requires a Declaration and submission of FCC Form 740 (attached as Exhibit 3). According to Form 740, making a false declaration (or failure to file a FCC Form 740) subjects the Importer to fines of up to $250,000 and/or up to 5 years imprisonment.

We request that the FCC search its records to determine if Redflex filed a Form 740 Declaration at any time in connection with the importation of the DRS-3 devices and whether a Temporary Grant was given by the FCC.

This letter is a Formal Complaint and request the FCC intercede and require Redflex to stop marketing, selling and using the DRS-3 radar antenna until such time as Type Acceptance is granted by the FCC. We also request that the FCC enforce any penalties that may be due as a result of potentially illegal actions and use.

The contact details for Redflex Traffic Systems are as follows:

Statutory Agent
Redflex Traffic Systems
c/o National Registered Agents, Inc.
Statutory Agent
638 N. 5th Avenue
Phoenix, AZ 85003

Corporate Offices
Redflex Traffic Systems
Ms. Karen Finley
President / CEO
15020 North 74th Street
Scottsdale, Arizona 85260

Thank you for your consideration on this matter. Please feel free to contact me directly at any time via telephone - (480) 596-4608, or email - philip.underhill@atsol.com

Sincerely,

**American Traffic Solutions, Inc.**

Philip Underhill
Vice President Project Delivery

cc: Jim Szeliga

fcc complaint - redflex use of drs-3 radar 080908

ATS003116

CONFIDENTIAL

# EXHIBIT 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


AMERICAN TRAFFIC SOLUTIONS,    )
INC.,                          )
                               )
        Plaintiff,             )
                               )   Case No. CV-08-2051
   vs.                         )   PHX-FJM
                               )
REDFLEX TRAFFIC SYSTEMS,       )
INC.; KAREN FINLEY; and        )
AARON M. ROSENBERG, Ph.D.,     )
                               )
        Defendants.            )   ATTORNEYS' EYES ONLY
_____    )


VIDEOTAPE DEPOSITION OF

AMERICAN TRAFFIC SOLUTIONS 30(b)(6)

ADAM TUTON


Friday, January 8, 2010

9:09 a.m. to 10:20 a.m.


Pages 1 through 57, inclusive, Volume 1


American Traffic Solutions
7681 E. Gray Road
Scottsdale, Arizona

Reported by Carol A. McCue, RMR
Arizona CR No. 50789

Assignment #116534

1      A.    Okay.

2      Q.    If I understand correctly.  And that is, item

3   number 25 asks for the following, quote, the factual

4   bases -- basis, sources of all information and an

5   explanation in support of ATS's claims that Redflex made

6   material misrepresentations and false statements in

7   relation to Redflex's contracts with each of the

8   locations listed in Appendix number 1.  You're prepared

9   to speak to that today?

10     A.    Yes.

11     Q.    All right.  What did you do to prepare to speak

12  on that subject?

13     A.    I referred to all of the submissions that we

14  have already submitted in this regard relating to the

15  non-FCC certified radar that Redflex used and that

16  Redflex indicated in its proposals that it would comply

17  with federal, state, and local laws, and which didn't.

18     Q.    Did you look at the proposals that ATS submitted

19  for each of the jurisdictions that are listed in

20  Appendix number 1?

21     A.    No, I did not.

22     Q.    Did you look at any of them?

23     A.    No.

24     Q.    Did you look at any of the requests for

25  proposals that any of these jurisdictions in Appendix

1    number 1 put out?

2        A.    No.

3        Q.    Did you look at ATS's responses to the proposals

4    in any of these jurisdictions?

5        A.    No.

6        Q.    All right.  So as I understand it, you looked at

7    the answers that have already been provided by your

8    company in response to written discovery requests?

9        A.    Yes.

10        Q.    Okay.  In the words of the company, then, give

11    me an explanation as to what ATS's claims are that

12    Redflex made material misrepresentations and false

13    statements.

14                MR. MCCLANAHAN:  Object to the form.

15                THE WITNESS:  I think that all that's been

16    stated already in the legal documents that have been

17    submitted.

18    BY MR. WALSH:

19        Q.    Do you have anything to add to that?

20        A.    I do not.

21        Q.    Do you contend that any of the photographs that

22    were used by ATS -- that were used by Redflex in its

23    proposals were material misrepresentations or false

24    statements?

25                MR. MCCLANAHAN:  Object to the form.

```
 1                THE WITNESS:  I think that that's been
 2   answered.
 3   BY MR. WALSH:
 4        Q.   I'm asking you now as a representative of the
 5   company.
 6        A.   I think they are false representations.
 7        Q.   Okay.  In what way?
 8        A.   They show a device that was neither certified
 9   nor available nor used in some if not all of the
10   proposals.
11        Q.   You're talking about the conical device that's
12   shown --
13        A.   Correct.
14        Q.   -- in the DPS -- the proposal to DPS?
15        A.   Right.
16        Q.   Okay.  That device was used in a number of
17   contracts that Redflex had, to your knowledge, correct?
18        A.   Correct.
19        Q.   So where it was actually used, that would not be
20   a misrepresentation as to what product was used,
21   correct?
22        A.   No.  It was neither certified by the FCC,
23   either.
24        Q.   But in terms of a conical device actually being
25   used where it was used, there wouldn't be a
```

```
 1      A.    Yes.

 2      Q.    The break we just had.  And did he speak with

 3  anyone to get that information?

 4      A.    No.  Not that I'm aware of.

 5      Q.    All right.  I have in front of you now, or I

 6  will have in front of you Exhibit 473.  These are your

 7  company's First Amended Objections and Responses to

 8  Redflex's First Set of Non-Uniform Interrogatories.  I

 9  don't see that they've been signed by anybody from the

10  company but they've been signed by Randy McClanahan, who

11  is the attorney for the company.

12            MR. WALSH:  Randy, I think we probably need

13  a verification from someone at the company, so I'll make

14  that request now so I don't forget about it.

15  BY MR. WALSH:

16      Q.    And if you'll turn to page number 4, there's a

17  question 6 at the bottom that says, identify all

18  material misrepresentations you -- you meaning ATS --

19  contend Redflex made to DPS as claimed in Paragraph 29

20  of your complaint.  Include as part of your response the

21  dates upon which you contend the misrepresentations were

22  made, who made those misrepresentations, to whom the

23  misrepresentations were made, and the factual basis upon

24  which you contend that the listed misrepresentations

25  were false.  And there's a lengthy answer that continues
```

```
 1    through to more than half the page on page 7.  Do you
 2    see that?
 3        A.   I do.
 4        Q.   That question was focused on DPS.  The notice of
 5    videotape deposition, 30(b)(6) deposition notice that we
 6    served on your company asked for all misrepresentations,
 7    material misrepresentations and false statements in
 8    relation to Redflex's contracts with each of the
 9    locations listed in Appendix number 1.  So it's DPS and
10    30 some others, which we've been told by your company in
11    another discovery response are the jurisdictions as to
12    which ATS is making a claim in this case.
13             So we have the answer as to DPS in the
14    interrogatory answers.  What information can you tell me
15    about misrepresentations that Redflex supposedly made in
16    the other jurisdictions under Appendix 1 other than
17    Arizona DPS?
18        A.   If -- well, there's two -- two things.  If -- if
19    we -- and we can start -- first of all, any -- any
20    mention of any radar in any of those proposals would
21    have been a misrepresentation inconsistent with what
22    we've said in this document.
23        Q.   Any mention of a radar?  Can you be more
24    specific?
25        A.   Any mention of any of the radars that Redflex
```

1    had proposed between 2000 and 2008, none of which were

2    certified by the FCC.

3        Q.    Well, do you know which radars Redflex proposed,

4    for example, if you turn to Appendix 1 there in

5    Exhibit -- what have you got, 469 there, I think?

6        A.    To the extent that Redflex identifies the name

7    of the their device as the 2000M, that would have been

8    one, but any radar because the only radars they used

9    were uncertified radars.

10       Q.    And how do you know that?

11       A.    How do I know that?  Because they've never used

12   any other radars.

13       Q.    Well, you're aware that Robot had a DRS-2 radar

14   that was certified by the FCC, correct?

15       A.    I believe so.

16             MR. MCCLANAHAN:  Object to the form of the

17   question.

18   BY MR. WALSH:

19       Q.    Do you know whether -- do you know whether

20   Redflex used the DRS-2 radar in any of the jurisdictions

21   that are listed in Appendix 1?

22       A.    I don't believe they did.

23       Q.    And what's the basis of your belief?

24       A.    I believe that -- I believe that we were told

25   that Redflex never bought a DRS-2.

```
 1      Q.   ATS was told that by whom?

 2      A.   It may have been Mr. Schmidt.

 3      Q.   At Robot?

 4      A.   At Robot.

 5      Q.   Did you speak to Mr. Schmidt or was it someone

 6   else?

 7      A.   Someone else.

 8      Q.   Who at the company spoke to Mr. Schmidt?

 9      A.   I believe it was Jim Tuton.

10      Q.   And you understand that that's what Jim Tuton

11   learned from Mr. Schmidt was that --

12      A.   Could be.  You -- you'd have to ask Jim Tuton.

13      Q.   All right.  So sticking with what's here on

14   Appendix 1, you've told me first that if Redflex made

15   any representation that it had a radar that it could

16   implement for speed enforcement, that would have been a

17   false statement; is that right?

18      A.   Yes.

19      Q.   Does ATS know for a fact that Redflex could not

20   have acquired an FCC certified radar to perform any of

21   these contracts?

22      A.   I don't know.

23      Q.   Do you, Adam Tuton, as an executive of the

24   company, know whether Redflex could have acquired an FCC

25   radar to perform any of these contracts?
```